EXHIBIT I

E-FILED
Skagit County Clerk
Skagit County, WA
02/24/21

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF SKAGIT

| | |
|---|---|
| COMMERCIAL COLD STORAGE, INC., a Washington corporation<br><br>Plaintiff,<br><br>vs.<br><br>THE CITY OF MT. VERNON, WASHINGTON, a Washington municipal corporation<br><br>Defendant. | NO: 21-2-00131-29<br><br>**COMPLAINT FOR DECLARATORY RELIEF, SPECIFIC PERFORMANCE, AND DAMAGES** |

COMES NOW the Plaintiff, by and through its undersigned attorneys, and files this Complaint against Defendant pursuant to CR 3 and 4. For its causes of action, Plaintiff alleges as follows:

**I. Parties, Jurisdiction, and Venue**

1.1   Plaintiff, Commercial Cold Storage, Inc. ("CCS"), is a Washington corporation, that owns real property and is doing business, in Mt. Vernon, Washington. Plaintiff owns and operates a seafood processing and cold storage facility that employs over 90 people.

COMPLAINT - 1

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

1.2     Defendant, the City of Mt. Vernon, Washington, ("City") is a Washington municipal corporation.

1.3     This Court has jurisdiction over the parties and the subject matter of this Complaint pursuant to RCW 4.28.185.

1.4     Venue is proper in Skagit County based on the following facts:

1.5.1   The property damage suffered by CCS as a result of the City's conduct occurred in Mt. Vernon, Washington;

1.5.2   The Property Rights Acquisition and Settlement Agreement executed by City and CCS on February 4, 2016 ("Settlement Agreement") expressly provides for jurisdiction and venue in this Court with respect to disputes that cannot be resolved amicably by the City and CCS.

## II. Facts

2.1     In March of 2017, pursuant to the terms of the Settlement Agreement between the City and CCS, and a separate construction contract between the City and Interwest Construction, Inc. ("ICI"), the construction firm selected by the City pursuant to a public bidding process, ICI began construction of that portion of the City's Downtown Flood Control Project "Project" that adjoins and crosses the real property of CCS.

2.2     Reichhardt & Ebe Engineering, Inc. ("R&E"), served as the City's outside engineer for the completion of Phase 3 B of the downtown flood control project. Among other things, R&E was responsible for the design of the Project.

COMPLAINT - 2

2.3     Pursuant to Section 15 of the Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, and Section 3.5 of the Permanent Easement Agreement between CCS and the City of the same date, a copy of which is attached as **Exhibit 2** hereto, a portion of the Project involved the removal, and replacement, by the City of the existing CCS stormwater and sanitary sewer lines in order to make room for the new floodwall foundation. Except in an emergency, the foregoing agreements required the City to ensure that CCS suffered no interruptions in its business activities as a result of the re-location of the sanitary and stormwater lines both during relocation of the lines, and after completion of the Project. *See* Section 5.3 of the Temporary Construction Easement Agreement, attached as **Exhibit 3** hereto.

2.4.    Subject to the City's indemnification obligations to CCS under Section 10 of the Settlement Agreement, Section 9 of the Settlement Agreement makes CCS responsible for the repair and maintenance of any re-located underground utilities, including the storm and sanitary sewer lines. In order to perform its repair and maintenance responsibilities, and ensure continued, uninterrupted use of such relocated underground utilities, CCS must be able to physically access the relocated storm and sanitary sewer lines.

2.5     The City, or its contractors, installed the new underground utilities in such a manner that CCS cannot physically access the underground utilities without damaging the foundation of that portion of the floodwall that crosses the property of CCS, pursuant to the rights granted the City under the Permanent Easement Agreement. The relocated sewer lines are embedded within the concrete foundation of the floodwall, and therefore cannot be externally

COMPLAINT - 3

accessed by CCS for repairs or maintenance. Any required excavation of the sewer lines for repair or maintenance purposes is virtually impossible without doing substantial damage to the floodwall foundation.

2.6 Access to the relocated sewer lines is restricted to manholes installed by the City which only provide limited access to the interior of the new sewer pipes. The "side sewer" connections from the CCS facility run at a right angle, or close to a right angle, to the main sewer line, and will be very difficult to access, even from the manholes, should a problem develop with those internal connections. These connections are also embedded within the concrete foundation of the flood wall. *See* attached photos set out in **Exhibit 4**. .

2.7 The City's design of the new relocated sewer line also ignored the fact that, apart from any maintenance or repair issues, CCS is now limited to the existing side sewer connections to the main sewer line, and will not be able to either expand the capacity of the existing side sewer lines, or install entirely new side sewer line connections to the main sewer line without damaging the floodwall foundation. The side sewer lines carry waste from CCS's seafood processing operations.. The foregoing limitations will also seriously restrict CCS's options in terms of redevelopment of its property. On information and belief, the design and installation of the re-located sewer system is not consistent with the drawings originally submitted by the City to FEMA for approval of the Conditional Letter of Map Revision, nor does it provide CCS with the same access to the re-located sewer lines that it had enjoyed with respect to its sewer lines prior to construction of the Project.

COMPLAINT - 4

2.8     The "side sewer" connections from the CCS facility run at a right angle to the main sewer line, and will be very difficult to access, even from the manholes, should a problem develop with those connections. These connections are also embedded within the concrete foundation of the flood wall. *See* photos in **Exhibit 4**. The City has also ignored the fact that, apart from any maintenance or repair issues, CCS is now limited to the existing side sewer connections to the main sewer line, and will not be able to either expand the capacity of the existing side sewer lines, or install entirely new connections to the main sewer line without damaging the floodwall foundation. The side sewer lines carry both process waste from CCS's operations, as well as sanitary waste.

2.9     With respect to the re-located stormwater sewer lines, the City not only installed a portion of such lines within the foundation of the new floodwall, it installed the lines in a manner that they penetrate the sheet piles that support the foundation of the floodwall in order to provide direct access to the Skagit River for stormwater disposal. According to the City, there are five separate stormwater lines serving CCS that penetrate the sheet piles based on the City's new stormwater disposal plan for CCS.. See **Exhibit 5**, a City drawing entitled "Post-Project Stormwater Facilities near Commercial Cold Storage." These lines drain stormwater that is generated by rain falling on CCS's property, as well as stormwater generated by rain falling on that portion of South 1st Street that fronts the CCS property.

2.10.   In order to prevent floodwaters from the Skagit River from backing up into CCS's property during flood events, the City installed "canal or storm gates" within the stormwater

COMPLAINT - 5

lines that discharge to the Skagit River than must be manually closed prior to, and during, expected flood events. *See* **Exhibit 5.** The City's Operation and Maintenance Manual for the Flood Wall does not specifically mention these "canal or storm gates," nor does it make it clear which party is responsible for closing them in advance of a flood event. CCS has not agreed to assume any such liability.

   2.11 Section 10.1 of the Settlement Agreement requires the City to indemnify CCS for any property damage suffered by CCS because of the negligent acts, errors, or omissions of City, or its agents. Interwest was acting as an agent of the City for the construction of that portion of the Project that crosses or adjoins CCS' property, pursuant to that certain agreement entitled "Contract—Downtown Flood Protection Project—Phase 3B—City of Mt. Vernon, Washington between Interwest and City dated November 1, 2016" ("Construction Contract").

   2.12 Section 5 (Indemnity) of the Permanent Easement Agreement obligates the City, as part of its indemnification obligations to CCS, "to correct and repair any defects, deficiencies, or damage which are proximately caused by the acts and undertakings of the City, its agents, employees, or contractors upon the Grantor Property, and shall restore the Grantor Property to as good condition as existed prior to the commencement of the applicable City work under this Permanent Easement Agreement." The defective design and installation of the re-located sanitary and stormwater sewer lines, and the associated loss of CCS property value, were proximately caused by the activities of City and Interwest on the Grantor Property that is subject to the Permanent Easement, i.e., on the property of CCS.

COMPLAINT - 6

2.13    Similar indemnification and repair obligations to those set out in Section 5 of the Permanent Easement Agreement are also contained in Section 7 of the Temporary Easement Agreement executed by CCS and the City on February 4, 2016.

2.14    Beginning in March 2017, and continuing through June 2017, Interwest engaged in construction activities on both the property acquired by the City from CCS under the Settlement Agreement, as well as on the CCS property immediately adjacent to buildings owned by CCS that is part of the "Grantor Property" covered by the Permanent Easement Agreement. Those construction activities included the removal of the existing CCS sanitary and stormwater sewer lines, and the construction of replacement storm and sanitary sewer lines. Other construction work performed by Interwest and the City, including the installation of the new floodwall, is the subject of pending litigation between the Parties in Case No. 18-2-00806-29 ("Related Case"). This complaint involves damages to CCS's property not covered in the Related Case, namely the failure of the City to install new sanitary and stormwater sewer lines that will (i) enable CCS to continue to conduct its business on an uninterrupted basis and (ii) ensure that CCS has the ability to access, repair and maintain those new sewer lines without causing damage to the foundation of the City's new floodwall.

2.15    CCS did not learn of these violations of the Settlement Agreement and the Permanent Easement Agreement until after the filing of the First Amended Complaint in the Related Case. Specifically, CCS discovered the defects in early January of 2020 as part of a review of photographs that were disclosed by the City to CCS in response to the CCS October 3,

COMPLAINT - 7

2017 Public Records Act request to the City. Those photographs show that the original CCS sanitary/storm water sewer lines that was removed by the City as part of the construction of the floodwall had been replaced by a new sewer line, significant portions of which are encased in rebar and concrete which form the foundation of the floodwall in certain areas where it crosses CCS's property. Attached as Exhibit 4 are copies of photographs reviewed by CCS that show the new sewer line encased in steel rebar before it was covered over with cement.

2.16   On information and belief, the original drawings submitted by the City in 2009 to the Federal Emergency Management Agency ("FEMA") as part of the City's request for a conditional letter of map revision ("CLOMR"), do not show the relocated CCS sewer lines as being incorporated into the foundation of the floodwall. Those drawings appear to show the replacement line running roughly along the same route as the original line. Those drawings were obtained by CCS pursuant to a separate CCS PRA request to the City dated February 6, 2020, and have only recently been disclosed to CCS by the City in response to that request. *See* Exhibit 3 to Rauch Declaration. Relevant portions of the drawings are attached as **Exhibit 6** hereto. CCS is not aware that the City ever notified FEMA of the changed location of the sewer line, much less received approval from FEMA for the change.

2.17   As noted above, those sections of the CCS sanitary sewer line that are now encased in concrete can no longer be uncovered by CCS for routine inspection, maintenance, or necessary repairs. Even the City's former Assistant Public Works Manager, Mike Love, admitted in an email to Janice Marlega, the R&E Project Director, dated February 23, 2017 that

COMPLAINT - 8

it would be extremely difficult for CCS to access the new sewer line if it needed to repair or modify an interconnection between the lines running from the CCS facility to the new sewer line. In that email Mr. Love stated: "If I was CCS for a day, I would ask that all the sewer currently connected stay connect[ed] *since future connection to this line will be extremely difficult*." (emphasis added). See <u>Exhibit 2</u> to Rauch Declaration.

   2.18 As Mr. Love acknowledged at the time to the R&E Project Engineer-- *without advising CCS*-- once the new sewer line was installed within the concrete foundation of the floodwall, it would be extremely difficult, if not impossible, to access that line to, among other things, (i) repair the CCS "side sewer" line interconnections, (ii) modify such interconnections, or (iii) install entirely new side sewer interconnections to meet future CCS business needs. *See* exhibit to Rauch Declaration. The same applies to any repairs to the sewer line itself, should it suffer damage. The only way to replace or perform major repairs to the new sewer line is to break up and remove the concrete and rebar that encases the sewer line, the same concrete and rebar which also serves as the foundation for the floodwall. On information and belief, neither FEMA nor the State Department of Ecology would ever allow such action since it could jeopardize the integrity of the floodwall. Any such action would also violate the City's own Shoreline Master Program which generally restricts any new construction activities *within 40 feet of the flood wall*.

   2.19 Both the Temporary Construction and Permanent Access Agreements executed by the City and CCS require that any relocation/replacement of the original CCS stormwater sewer

COMPLAINT - 9

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

lines ensure that CCS will have continued access to, and the uninterrupted use of, the new stormwater lines following completion of the Project. Section 3.5 of the Permanent Easement Agreement provides: "City acknowledges that Granter must continue to have storm water disposal access to the Skagit River and/or public stormwater facilities following completion of the Project." This covenant requires that CCS has stormwater disposal access at all times, even during flood events.

2.20   Even if the canal or the storm gates in the new stormwater lines are manually closed prior to a flood event, and operate properly during the event, it means that stormwater generated on CCS's property by rain that falls during the same flood event has nowhere to go—it will back up on CCS's property since (i) there is no alternate stormwater disposal route; (ii) the floodwall stop logs will have been deployed, and (iii) the canal gate valves in the stormwater lines leading to the outside of the wall will have been closed so that flood water can't back up through such lines into CCS's property.  In a major "pineapple express," or other major rain event, CCS's buildings will be completely flooded just from stormwater that is "imprisoned" behind the floodwall, and will have nowhere to go, except into CCS's facilities, and ultimately out into South 1st Street, depending on the severity of the rainfall associated with the flood event.

2.21   Section 3.2 of the Permanent Easement Agreement gives the City the right to exclude all persons, including presumably CCS personnel, from the Permanent Easement area during a flood event.  Should the City invoke this provision, CCS could be prohibited from even gaining access to its own property to protect it from stormwater flooding behind the floodwall.

COMPLAINT - 10

2.22   CCS has also recently learned that the original plans submitted to FEMA by the City in connection with the City's request for the CLOMR did not show the CCS storm water lines penetrating the floodwall, but rather provided that the new stormwater line would run behind the floodwall and empty into an existing manhole south of the CCS south cold storage building.  Relevant portions of the drawings showing the original design are attached as <u>Exhibit 6</u>.  CCS is not aware that the City ever notified FEMA of the changed design of the stormwater sewer lines, much less received approval from FEMA for the change.

2.23   As recently as July 14, 2014, it appears that the City was still committed to running a separate stormwater collection sewer line that would carry floodwater from the CCS property to a bioswale south of the CCS property where it would be treated, and from there it would be conveyed in a combined sanitary/stormwater sewer line to -STA 4960 194 LT.  *See* July 14, 2014 email exchange between Janice Marlega and Louis Ponce of R&E, set out in <u>Exhibit 1</u> to Rauch Declaration.

2.24   At some point between July 14, 2014 and March 2017, the City made fundamental changes to the design of the CCS stormwater disposal system.  Instead of stormwater generated on CCS's property being collected and conveyed via a new line to a location at STA 4960 194 LT where it could be treated, and then conveyed to either the River or the City's sewage treatment plant, the City decided to penetrate the sheet pile foundation of the new floodwall, and convey the stormwater directly to the Skagit River—without making any provision for stormwater disposal during flood events when those same pipes had to be closed

COMPLAINT - 11

using the "canal gates" in order to prevent floodwaters from backing up into CCS's property.

2.25   Attached as **Exhibit 7** is a photograph of temporary pumping equipment installed by the City to remove floodwater from the CCS property during a November 2017 flood event. On information and belief, the water had entered the CCS property by backing up through the storm water drainage pipe nearest to the CCS north loading dock, and had collected behind the floodwall in a catch basin. This is the stormwater outlet pipe that is lowest in elevation of the five that penetrate the flood wall. The City has never explained what happened. The City has now removed the pumping equipment. CCS is not aware that the City has taken any action to permanently solve the problem.

2.26   The City represented to FEMA in its official O&M plan for the flood wall that there are no pumps or mechanical devices required for proper operation of the floodwall. On page 9 of the official O&M plan for the flood control project that was submitted to FEMA to obtain final approval of the proposed Letter of Map Revision, the City stated: "Some levee systems require pumps and mechanical devices to handle the backside or tributary drainage issues. There are no pumps or mechanical devices with the current list of levees that the City of Mount Vernon maintains."

2.27   CCS has attempted to get the City to take corrective action to address the problems set out in this complaint pursuant to the dispute resolution provisions contained in the Settlement Agreement, but the City has refused to acknowledge liability, or take the necessary corrective actions. CCS has sent two separate letters to counsel for the City seeking to resolve the issues

COMPLAINT - 12

raised in this Complaint via the dispute resolution process set out in Section 20 of the Settlement Agreement. The City has flatly rejected those efforts, and has refused to schedule a dispute resolution meeting. *See* Rauch Declaration at ¶11, and <u>Exhibit 7</u> thereto.

2.28   In the second of those two letters CCS proposed that, if the City is so confident in the design and installation of the re-located CCS sewer system, that the City assume responsibility for repairs and maintenance of the system, and indemnify CCS for any losses that CCS sustains due to the unavailability of either storm or sanitary sewer service. In exchange, CCS offered to drop its claims against the City regarding the defective sewer system. The City has not responded to that proposal. CCS can only assume that the lack of a response indicates City's rejection of the proposal. *See* Rauch Declaration at ¶7.  The City has also refused to schedule a meeting with CCS via Zoom or other virtual meeting software to discuss resolution of the dispute. Based on the City's refusal to engage in good faith negotiations to resolve its claims, CCS has filed this lawsuit.

### III. First Cause of Action – Declaratory Judgment

3.1   Plaintiff incorporates by reference, and re-alleges, each and every allegation set forth in paragraphs 1.1 through 2.28, as if fully stated herein.

3.2   Defendant, City, violated the Settlement Agreement by failing to complete the relocation of the CCS sanitary and stormwater sewer system in a manner that allows CCS to perform repairs and maintenance on the system consistent with CCS's obligations under Section 9 of the Settlement Agreement. The inability to conduct such repairs and maintenance could require the shutdown of CCS's facilities. Such failure represents a defect in the design and installation of the replacement sewer system which the City is obligated to correct pursuant to

COMPLAINT - 13

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

Section 5 of the Permanent Easement Agreement. The City left CCS with a redesigned system that was is not as accessible as its original system, and which restricts CCS's ability to make future modifications to the system.

3.3   Defendant City failed to install the relocated CCS sanitary and stormwater sewer system in a manner that is consistent with the representations made by the City to FEMA as part of its CLOMR application in 2009. On information and belief, the City failed to notify FEMA of the changed design, nor did the City obtain FEMA's approval of such modifications. Had the City complied with the drawings it submitted to FEMA in 2009, CCS would still have continued, unobstructed access to the re-located sewer lines and the ability to complete repairs to the lines since they would not have been encased in concrete. CCS was never notified of the change in plans by the City.

3.4   Plaintiff also seeks a declaratory judgment that the City violated its obligations to CCS under Section 3.5 of the Permanent Easement Agreement and Section 5.3 of the Temporary Easement that "Granter must continue to have storm water disposal access to the Skagit River and/or public stormwater facilities following completion of the Project." The design of the new stormwater disposal system cuts off CCS's ability to dispose of stormwater generated during flood events since the "canal gates" installed by the City in the CCS stormwater discharge pipes must be closed to prevent flood water from backing up through the pipes and entering CCS's property. Under such circumstances, the Permanent Easement Agreement requires the City to install an alternative stormwater disposal system for use by CCS that will continue to function during flood events, and which does not rely on temporary measures.

3.5   CCS is also seeking a declaratory judgment that the City's obligation to CCS under Section 5 of the Permanent Easement Agreement to "restore the Grantor Property to as

COMPLAINT - 14

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

good condition as existed prior to the commencement of the applicable City work under this Easement Agreement" includes (a) the installation of an alternative storm/sanitary sewer line, given that under current circumstances it is not physically possible for CCS to access portions of the replacement line installed by the City due its integration into the foundation of the flood wall, and (b) measures to prevent storm water from backing up behind the floodwall on to the property of CCS during flood events when the "canal gates" are closed.

3.6   To the extent that such remedial measures will require new, temporary construction easements, or permanent easements, from CCS, CCS seeks a declaratory judgment that the City must compensate CCS for the fair market value of any such easements, as well as ensure that the terms of such easements are at least as favorable to CCS as those contained in the original Temporary Construction and Permanent Easement Agreements between the City and CCS.

3.7   CCS also seeks a declaratory judgment that CCS has ownership of the replacement sewer lines installed by the City, consistent with the fact that CCS owned the original lines that were removed by the City.  In the event that the City disputes CCS's ownership, CCS seeks a declaratory judgment defining where CCS's ownership of its "side sewer" lines begins and ends.

3.8   In the alternative, if the Court determines that the City owns the new sewer lines, CCS seeks a declaratory judgment that the City, not CCS, is responsible for the repair and maintenance of such lines, as well a declaratory judgment that the City is obligated to reimburse CCS for any and all losses associated with an interruption in either sanitary and/or stormwater services arising from the City's failure or inability to maintain the lines, or otherwise ensure that

COMPLAINT - 15

CCS has such sewer services on an uninterrupted basis, as required by the Permanent Easement Agreement.

### IV. Second Cause of Action – Breach of Contract

4.1     Plaintiff incorporates by reference, and re-alleges, each and every allegation set forth in paragraphs 1.1 through 3.8, as if fully stated herein.

4.2     City has breached its obligations to CCS under Section 5 of the Permanent Easement Agreement to "restore the Grantor Property to as good condition as existed prior to the commencement of the applicable City work under this Easement Agreement." The failure to provide CCS with a new, replacement storm and sanitary sewer system that is as accessible, repairable, and expandable as the original CCS system constitutes a breach of Section 5 of the Permanent Easement Agreement.

4.3     City has breached its obligations to CCS under Section 3.5 of the Permanent Easement Agreement to ensure that CCS "continues to have storm water disposal access to the Skagit River and/or public stormwater facilities following completion of the Project." Specifically, the City has failed to install a stormwater disposal system that can safely, reliably and continuously dispose of storm water generated on the CCS property and on the adjoining South 1st Street during flood events. This failure violates Section 3.5 of the Permanent Easement Agreement. The use of temporary pumping facilities to remove stormwater generated on CCS property during flood events is (i) not authorized by the Permanent Easement Agreement nor the O&M Plan adopted by the City for the floodwall (ii) is not a reliable method for removing stormwater since the City may not be able to install the pumps in a timely fashion, the pumps

COMPLAINT - 16

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

may fail, or be overwhelmed by large amounts of stormwater, (iii) have not been permanently installed and (iv) have not been authorized by either FEMA or the State Department of Ecology as an approved method of stormwater disposal.

4.4 The foregoing breaches of the Permanent Easement Agreement by City have exposed CCS to extended interruptions in its ability to conduct its business, and have resulted in a diminution in the value of CCS's property. Such breaches may also expose CCS to regulatory action from the Department of Ecology. City has refused to indemnify CCS against such losses in violation of both the Settlement Agreement and the Permanent Easement Agreement.

4.5 Plaintiff seeks recovery from City of all damages suffered by Plaintiff as a result of the foregoing breaches of the City's contractual obligations to CCS.

## V. Third Cause of Action: Specific Performance

5.1 Plaintiff incorporates by reference, and re-alleges, each and every allegation set forth in paragraphs 1.1 through 4.5, as if fully stated herein.

5.2 City has breached its obligations to CCS under Section 5 of the Permanent Easement Agreement to "restore the Grantor Property to as good condition as existed prior to the commencement of the applicable City work under this Easement Agreement."

5.3 City has breached its obligations to CCS under Section 3.5 of the Permanent Easement Agreement to ensure that CCS "continues to have storm water disposal access to the Skagit River and/or public stormwater facilities following completion of the Project."

5.4 CCS seeks specific enforcement of the foregoing obligations through an order that requires City to install, at the City's sole cost, a new sanitary/stormwater disposal system, the design and installation of which shall be reasonably acceptable to CCS, that will comply with

COMPLAINT - 17

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

City's obligations to CCS under the Settlement Agreement, the Temporary Construction Easement Agreement, and the Permanent Easement Agreement. CCS further requests an order that all such work be completed (i) without interruption to CCS's business; (ii) in compliance with applicable law and all necessary permits; and (iii) by no later than October 30, 2021.

5.5  To the extent that the City cannot complete the foregoing work without interrupting CCS's business, and/or fails to complete its obligations to CCS set out herein in a timely manner, CCS also seeks monetary damages for its business interruption losses and any diminution in the value of its property.

## V. **PRAYER FOR RELIEF**

WHEREFORE, CCS prays for the following relief:

a.  For a declaration consistent with the pleadings herein;

b.  For an award of all money damages legally available as a result of Defendant's breaches, acts, and/or omissions;

c.  For fair compensation to CCS for any new temporary construction and permanent easements required from CCS to complete the City's obligations to CCS, as set out herein.

d.  For an order of specific performance consistent with Section 5.4, as well as an order, consistent with section 5.5, compensating CCS for any business interruption losses and/or permanent diminution in the value of its property as a result of the City's failure to specifically perform its obligations to CCS with respect to the sanitary and stormwater sewer lines.

e.  For costs and attorneys' fees in accordance with *Olympic Steamship Co., Inc. v. Centennial Ins. Co.*, 117 Wash.2d 37, 811 P.2d 673 (1991) and its progeny;

f.  For an award of reasonable attorney fees and the actual and statutory litigation costs Plaintiffs incur, including expert witness fees, pursuant to RCW 48.30.015(3); and

COMPLAENT - 18

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022

g.  For an award of pre- and post-judgment interest, as applicable;

h.  For all other relief that this Court deems just and equitable.

### JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable, assuming such jury trial can be scheduled and conducted prior to August 1, 2021. If such trial is not feasible prior to such date due to ongoing restrictions on jury trials arising from the current COVID-19 pandemic, Plaintiff requests an expedited bench trial on the issues set out herein.

Respectfully submitted this 24th day of February 2021.

                                      **COMMERCIAL COLD STORAGE, INC.**
                                      By: LAW OFFICES OF ROBERT J. RAUCH

                                      By _/s/ Robert J. Rauch_
                                      Robert J. Rauch, WSBA #36031
                                      Attorney for Plaintiff
                                      1159 Chuckanut Ridge Drive
                                      Bow, Washington 98232
                                      Telephone: (360) 766-4140
                                      Facsimile: (360) 766-5022
                                      Email: Bob@rjrauch.com

COMPLAINT - 19

Law Offices of Robert J. Rauch
1159 Chuckanut Ridge Drive
Bow, Washington 9823
Phone: 360-766-4140
Fax: 360-766-5022